1

2

3

4

5

Lisa A. McClane, Bar #10139
**JACKSON LEWIS P.C.**
3800 Howard Hughes Pkwy, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 921-2460
Fax: (702) 921-2461
lisa.mcclane@jacksonlewis.com
*Attorney for Defendant Aria Resort & Casino, LLC*

6

7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8

9

10

11

12

13

14

PATRICIA A. WILLIAMS,

       Plaintiff,

   vs.

ARIA RESORT & CASINO HOLDINGS,
LLC, a Nevada limited liability company; and
ARIA RESORT & CASINO, LLC, a Nevada
limited liability company,

       Defendants.

Case No. 2:17-cv-01484-JCM-VCF

**DEFENDANT ARIA'S MOTION FOR
SUMMARY JUDGMENT**

15

16

17

18

19

Defendant Aria Resort & Casino, LLC ("Aria" or "Defendant"), by and through its counsel, moves for summary judgment in its favor and against Plaintiff Patricia A. Williams ("Williams"). This Motion is based upon Fed. R. Civ. P. 56, the following Memorandum of Points and Authorities, the exhibits attached hereto, and such other argument the Court may wish to consider.

Dated this 30th day of November, 2018.

20

21

22

23

24

25

JACKSON LEWIS P.C.


      /s/ Lisa A. McClane
Lisa A. McClane, Bar No. 10139
3800 Howard Hughes Parkway Suite 600
Las Vegas, Nevada  89169
 *Attorneys for Aria Resort & Casino*

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

This is an employment case where a disgruntled former employee, Williams, who was terminated for multiple incidents of rude and discourteous conduct toward her fellow co-workers, filed a complaint against her former employer, Aria alleging: (1) retaliation in violation of Title VII, (2) race discrimination and harassment in violation of Title VII and Section 1981; (3) sex discrimination and harassment in violation of Title VII; (4) assault and battery; (5) negligent supervision. None of Williams' claims have legal merit and as set for the below, Aria is entitled to judgment as a matter of law.

First, Williams' assault and battery claim must be dismissed because her claims are untimely and they are barred by the NIIA and Nevada Revised Statute 41.475. The conduct upon which her assault and battery claims rest allegedly occurred between 2013 and February 10, 2015, more than two years prior to the date when she filed her Complaint. *See* Nev. Rev. Stat. § 11.190(4)(c); Compl. at ECF No. 1. Since Williams claims that the alleged conduct occurred while she was at work, the Nevada Industrial Insurance Act ("NIIA") is her exclusive remedy. *See* Nev. Rev. Stat. § 616B.612(4); *Wood v.* Safeway, 121 Nev. 724, 121 P.3d 1026 (2005). Additionally, even if the conduct occurred and her claim was timely (it is not), Aria still cannot be held liable because Williams testified that the conduct was the result of deliberate acts of her co-workers which were not part of the tasks or jobs they were assigned by Aria. *See* Nev. Rev. Stat. § 41.475 (barring employer liability for independent ventures of employees that are not and reasonably foreseeable results of the tasks assigned by the employer).

Second, Williams' negligent supervision claim fails as a matter of law because it is premised solely on alleged discriminatory conduct and the Nevada Supreme Court does not recognize tort claims for which adequate statutory remedies exist. *See Sands Regent v. Valgardson*, 105 Nev. 436 (1989). In addition, her negligence claim is also barred by the NIIA which provides the exclusive remedy for injuries arising in the workplace. *Conway v. Circus Circus Casinos*, 116 Nev. 870, 8 P.3d 837, 839 (2000).

Third, Woods' race and sex discrimination claims fail because she cannot show that she was performing her job in a satisfactory manner prior to her termination.  She had a well-document history of performance deficiencies and received a Last and Final Warning on April 24, 2015 for rude and discourteous behavior toward a co-worker named George Reed before she engaged in another situation involving rude and discourteous behavior toward another co-worker approximately seven months later.  Williams also cannot demonstrate that a similarly situated person outside of her protected class was treated more favorably than she was treated.  Moreover, even if the court determined that Williams could establish a prima facie case of discrimination, Aria has presented evidence that the reason for discipline was legitimate and nondiscriminatory based on her rude, discourteous conduct toward in violation of her April 24, 2015 Last and Final Warning.  Williams has not presented any evidence, much less the significant and substantial evidence required to demonstrate pretext.  Therefore, she has not demonstrated a genuine issue of material fact exists sufficient to preclude summary judgment in Aria's favor on her race and sex discrimination claims.

Fourth, Williams' race and sex harassment cannot survive summary judgment because the conduct about which she complains was neither severe nor pervasive.  Rather, Williams' harassment claims consist of allegations that on a couple of isolated days she was bumped by co-workers and on another single occasion, coworkers allegedly discussed her race.  These were sporadic and isolated events which were not extremely serious and did not amount to discriminatory changes in the terms and conditions of her employment.  *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, (1993).

Fifth, Williams' retaliation claim fails as a matter of law because she cannot establish any causal connection between her protected activity and termination.  There was more than 11 months between the time Williams spoke to human resources and her termination, therefore, she cannot establish causation through temporal proximity.  *See Villiarimo v. Aloha Air,* 281 F.3d 1054, 1068 (9th Cir. 2002).  Additionally, Williams admits that she never told anyone about her protected activity and that she does not know for sure whether any of her co-workers were aware she went to human resources.  She certainly cannot demonstrate, as she must, that "but for" her protected

1  activity she would not have been terminated or subjected to adverse conduct by her coworkers. *See*

2  *University of Texas Sw. Med. Ctr. v.. Nassar*, 570 U.S. 338, 360 (2013).

3  Ultimately, no genuine issues of material fact exist on any of Williams' claims and Aria is

4  entitled to judgment as a matter of law.

5  **II.    UNDISPUTED FACTS**

6      **A.    ARIA IS COMMITTED TO EQUAL EMPLOYMENT OPPORTUNITIES
           AND MAINTAINAING A WORKPLACE FREE OF DISCRIMINATION,
7          HARASSMENT AND RETALIATION.**

8  Aria is an equal opportunity employer committed to providing its employees with a

9  workplace free from unlawful discrimination, harassment, and retaliation. Its decisions concerning

10 employees are made without regard to race, sex, and any other characteristic protected by federal,

11 state, or local laws. **Exhibit 1,** at ARIA-0674. Aria maintains and distributes policies against

12 discrimination, harassment, and retaliation. **Exhibit 2**, Deposition of Tamara Lelyk ("Lelyk

13 Depo.") at 82:8-87:12. The policies expressly prohibit employees from engaging in any form of

14 discrimination or harassment based on race, sex, or other protected characteristics. **Exhibit 1,** at

15 ARIA-0674-0675, 0677.

16 The policies also instruct employees to report any suspected incidents of discrimination,

17 harassment, or retaliation they witness or experience. *Id.* at ARIA-0674, 0679. Aria employees

18 have several avenues available through which to make complaints. *Id.* For instance, can report

19 concerns of discrimination, harassment, or retaliation to Aria's Human Resources, including

20 Employee Relations, the Director of Human Resources, or the Vice President of Human Resources.

21 If the employee is uncomfortable reporting the conduct to Human Resources, he or she may report

22 the matter to any member of management or senior management. *Id.* Williams acknowledged

23 receiving and understanding Aria's policies concerning discrimination, harassment, and retaliation.

24 **Exhibit 3** at ARIA-0004; **Exhibit 2**, Lelyk Depo. at 84:25-85-5**; Exhibit 4**, Lelyk Declaration

25 ("Lelyk Dec.") at ¶ 3.

26

27

28

### B.   WILLIAMS' EMPLOYMENT WITH ARIA AND DISCIPLINARY HISTORY.

On or about November 30, 2009, Williams began working as a cook in the in-room dining department ("IRD" or "room service").   **Exhibit 5,** Deposition of Patricia Williams ("Williams Depo.") at 11:11-17; **Exhibit 6**, at ARIA-0039.   As a cook, the terms and conditions of Williams' employment were governed by a Collective Bargaining Agreement ("CBA") between Aria and Culinary Union 226 ("Union").   **Exhibit 4,** Lelyk Dec. at ¶ 4.   Aria follows a practice of imposing progressive discipline under the applicable CBA, generally meaning that repeated instances of misconduct, policy violations, or other prohibited behavior result in escalating levels of discipline. **Exhibit 7** at ARIA-0738.

Williams had multiple performance and conduct issues throughout her employment at Aria. For instance:

- On May 14, 2010 she received a verbal warning for leaving her work station with a number of tickets hanging and not communicating with employees about pending orders.  **Exhibit 8** at ARIA-0048.[1]

- On February 1, 2011, Williams received a written warning for unsatisfactory work performance after she left five (5) tickets on the printer and did not start preparing orders which were placed prior to the end of her shift.  *Id.*  at ARIA-0051.

- On April 11, 2011 she got a second written warning for unsatisfactory job performance relating to late preparation of food orders and failure to communicate with chefs when assistance was needed.[2]  *Id.*  at ARIA-0053, 0058, 0060.

- On June 7, 2011, Williams received a written warning for violation of health code and policy and the following day was issued a one day suspension without pay due to unsatisfactory performance when she cooked a food order and attempted to store

---

[1]   Williams refused to sign this warning and claimed she was on her station until her shift ended at 10 p.m.  ARIA-0049.

[2]   At least fifteen of Williams' employees signed a letter complaining about how rude Williams was to others, how difficult she was to work with and her lack of communication and teamwork.  **Exhibit 9**, at PAW 0011.

it for approximately three hours prior to its delivery.  **Exhibit 8** at ARIA-0066-0070.

- On or about November 21, 2011, she received a three day suspension without pay for unsatisfactory performance and violation of the company's conduct standards. *Id.* at ARIA-0071.

- On May 26, 2014, she received a verbal warning for unsatisfactory job performance after she left a ticket on the printer for 10 minutes when the kitchen was already running 30 minutes behind.  *Id.* at ARIA-0072; and

- On July 22, 2014 she received another written warning relating to unsatisfactory work performance.  *Id.*  at ARIA-0074, 0075.

### C.    HUMAN RESOURCES FEBRUARY 2015 IRD INVESTIGATION

On or about February 9, 2015, Williams went to speak with Aria's Employee Relations Manager, Richard Todd Owen ("Owen"), to inquire about her seniority as she believed she was in first position for seniority and was interested in transferring to the TMobile Arena when it opened. **Exhibit 5**, Williams Depo. at 62:9-12; 68:25-69:21; **Exhibit 29,** Declaration of Richard Todd Owen ("Owen Dec.") at ¶3.  After discussing Williams' seniority, Owens asked her some general questions about her work environment as he was conducting an investigation into allegations brought by an in-room dining ("IRD") server concerning other IRD servers.  *Id.* at 62:-13-63:1.

Williams did not provide any negative information about the servers who were the focus of the investigation and was reluctant to provide additional information other than to say she had observed the use of profanity and sexualized comments but did not want to get anyone in trouble. *Id.* at 63:2, 18-19.  **Exhibit 2,** Lelyk Depo. at 38:10-24.  Owen asked Williams if she could provide him a written statement or email.  **Exhibit 5,** Williams Depo. at 63:16-17.  Shortly after this meeting, Williams sent Owen an email. **Exhibit 5,** Williams Depo at 63:22-23.  In her February 10, 2015 email, Williams described alleged incidents where employees used profanity and engaged in horseplay and practical jokes as well as sexualized conversations. **Exhibit 10** at ARIA-0865. Notably, Williams did not make any allegations that employees discussed her ethnicity, race or the color of her skin or eyes.  **Exhibit 2,** Lelyk Depo. at 51:21-52:1.  She likewise did not make any

allegation that anyone ever engaged in sexualized conduct toward her or made any sexualized comments to or about her.  *Id.*at 52:7-9.

Although Owen and his team met with all IRD employees during the course of the IRD investigation, no one corroborated the allegations contained in Williams' February 10, 2015 email relating to the individuals specifically referenced.  **Exhibit 2,** Lelyk Depo. 65:23-66:20; 71:12-72:25; **Exhibit 29**, Owen Dec. at ¶ 4.   However, where violations of company policy were confirmed, such as with the IRD servers, Last and Final Warnings were issued.  *Id.* at 66:1-20. Additionally, Owen held preshift meetings in IRD reminding employees of the company's policies and how to report concerns or inappropriate conduct.  *Id.* at 67:15-68:2.  As a further preventative measure, Aria also conducted in person training classes regarding harassment for all IRD employees.  *Id.* at 68:2-3; **Exhibit 5**, Williams Depo. at 64:19-21.

Williams was unable to identify any evidence demonstrating that her co-workers knew about her February 2015 communications with Owen.  In fact, during her deposition, Williams was asked:

Q    Did you tell other employees that you had spoken with Todd [Owen]?

A    No.  But that's the thing –

Q    So how would they – did they ask you if you had spoken with Todd [Owen]?

A    No.

Q    So how do you know that they knew you had spoken with Todd [Owen]?

A    All I know is that I was told it was going to be confidential, but from the – from the intensity of how things kind of escalated, as far as how they were treating me – and everyone knew that they had the investigation going on in room service because the whole entire room service was involved in the investigation.

    …

Q    You didn't talk with any of the employees, your coworkers about you speaking with Todd [Owen] about it?

A    No.

    …

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Q       But you don't know that anybody really truly knew that you had spoken to
> Todd?
>
> A       I don't know if they knew. . .

**Exhibit 5,** Williams Depo. at 67:25-68:13, 68:21-24, 71:3-6.

D.       **WILLIAMS' APRIL 2015 INCIDENT WITH GEORGE REED RESULTS IN LAST AND FINAL WARNINGS FOR BOTH EMPLOYEES**

On April 15, 2018 at approximately 8:45 p.m., Williams was engaged in a highly unprofessional verbal altercation with another cook, George Reed ("Reed"). Williams was facing the hotline opposite her station and when she turned around, Reed was behind her. **Exhibit 5,** Williams Depo. 45:15-16. Reed was trying to obtain items from a drawer behind her. *Id.* at 45:20-21. Williams did not realize Reed was there and, according to her, she asked him to step to the side so they did not touch. *Id.* at 45:17-25. Reed said that Williams told him he was too close and "shouldn't touch her." **Exhibit 11,** at ARIA-0870. Reed provided a written statement claiming that Williams "used extremely rude and vulgar language, at a very high and obscene level" and that she accused him of "unwarranted contact." **Exhibit 12,** at ARIA-0090. Williams also provided a written statement claiming Reed was yelling at her, called her a liar, and insisted that he was not touching her.[3] **Exhibit 13,** at ARIA-0093**; Exhibit 5,** Williams Depo. at 46:1-3.

The chef on duty approached them because they were loud and when they would not stop arguing and attempted to separate them by sending Reed to the chef's office. **Exhibit 11,** ARIA-0870; **Exhibit 5,** Williams Depo. at 125:25-126:3**.** Once in the chef's office, Reed explained his side of the story and then left the IRD kitchen at 9:00 p.m. when his shift ended.[4] *Id.;* **Exhibit 14**

---

[3]       Williams admitted in her deposition that Reed never touched her on this occasion or at any other time. **Exhibit 5,** Williams Depo. at 45:6-7; 46:4-5.

[4]       When Williams got off work an hour later at 10 p.m., and saw Reed standing in the lobby, she thought he was waiting for her and assumed he was going to try to hurt her or her car. **Exhibit 5,** Williams Depo. at 128:12-129:15. She filed a report with security and Reed was instructed to leave the property since he was no longer on duty. *Id.* at 129:3; **Exhibit 15,** ARIA-0872. It was ultimately determined Reed was waiting for another employee to get off work to help with submission of a vacation request. *Id.;* **Exhibit 16**, ARIA-0086; **Exhibit 2,** Lelyk Depo. at 75:19-76:5. Reed did not say anything to her when she saw him in the lobby and there was no damage to Williams or her car and. **Exhibit 5**, Williams Depo. at 129:6-12.

at ARIA-0203.

Additional witnesses also provided statements indicating that both Reed and Williams were arguing and yelling at each other. **Exhibit 11** at **ARIA 0870, Exhibit 16** at ARIA-0087, **Exhibit 18** at ARIA-0094**.** Human Resources Business Partner, Frank Quezada ("Quezada"), also met with Williams to discuss the incident. **Exhibit 5,** Williams Depo. at 133:24-5. As a result of their conduct on April 15, 2015, both Williams and Reed were issued a Last and Final Warning for discourteous and rude conduct. **Exhibit 19** at ARIA-0076, **Exhibit 20** at 0095. The Last and Final Warnings specifically warned that "[a]ny future violations that are [the] same or similar in nature will result in suspension pending investigation with possible loss [of] employment." *Id.* Williams was aware of this warning and the consequences for future misconduct.[5] **Exhibit 5,** Williams Depo. 132:2-5.

### E. THE INCIDENT WITH GUADALUPE JIMINEZ THAT RESULTED IN WILLIAMS' TERMINATION.

On or about December 1, 2015, Williams was involved in another verbal altercation, this time with a co-worker named Guadalupe Jiminez ("Jiminez"). **Exhibit 22,** PAW 0030. Williams picked up a ticket with a food order off the printer. Williams claims when she realized it was for an item Jiminez would be responsible for preparing, she hung the ticket on Jiminez' station. **Exhibit 5,** Williams Depo. at 150:15-151:6. She contends Jiminez then rushed over and yelled at her, "didn't I tell you not to touch my tickets?" *Id.* at 151:11-12.

As a result of this interaction, Jiminez made a verbal complaint to management and on December 4, 2015, Williams was suspended pending investigation ("SPI"). **Exhibit 25, PAW 0031.** Aria does not consider SPIs disciplinary actions. **Exhibit** 2, Lelyk Depo at 40:7-8. Rather,

---

[5] Williams filed a grievance with the Union because she thought she was being falsely accused and she should not have been disciplined. **Exhibit 21,** PAW 0036. Notably however, Williams did not include any allegations of discrimination or harassment relating to her gender or race in her grievance. **Exhibit 21,** PAW 0036. Williams admitted she did not include any comments about alleged racial or sexualized conduct with her grievance because she "didn't want anyone to know." **Exhibit 5,** Williams Depo. 138:23:-24. Likewise, she did not include any allegation of retaliation or refer to any prior protected activity. **Exhibit 21,** PAW 0036.

they are intended to remove employees from the workplace until an investigation is completed. *Id.* at 4-6.

During the investigation witness statements were gathered. However, none of the other employees who witnessed the event said that Jiminez was yelling or otherwise acting in a rude or discourteous manner. Instead, Luisa Silva ("Silva"), someone Williams considered a friend, provided a statement saying:

> . . . I was working in the "Pantry Line" where I heard an argument between Guadalupe [J]iminez and Patricia Williams; when ***Mrs. Patricia yelled in a very aggressive and disrespectful tone "oh . . . shut up" "you nasty",*** and ***"leave me alone"*** when Guadalupe [J]iminez only responded . . . "don't touch my tickets please[.]

**Exhibit 23** at ARIA-0080; **Exhibit 5** at 159:17-19. Another employee, Emilio Miranda, said that when Jiminez told Williams not to touch his tickets she "responded in a bad way." *Id.* at ARIA-0079. Miranda also said Williams "started to scream at [Jiminez]" and told Jiminez to "shut up" and said she "did not want to speak with him." **Exhibit 24** at ARIA-0079.

On December 10, 2015, Williams attended what Aria refers to as a "due process meeting." **Exhibit 26,** at ARIA-0103. The purpose of the due process meeting is to speak with employees about the pending matter and allow them an opportunity to tell their side of story and provide any other information they feel may be relevant. **Exhibit 2,** Lelyk Depo. at 52:15-53:4. Quezada facilitated the due process meeting which was attended by Williams, Executive Room Chef Brendan Arenth, and shop steward Palmira Hermosillo. **Exhibit 5**, ARIA-0103**.** During the due process meeting, Williams admitted she told Jiminez to shut up and told him not to talk to her but insisted she was not rude and denied calling him nasty. *Id.*; **Exhibit 2,** Lelyk Depo. at 53:15-18. When asked why other employees might say she was loud, aggressive, and told her co-worker he was nasty and to shut up, Williams said everybody wanted her fired because she did not engage in gossip. *Id.* She did not make any reference to alleged discrimination or harassment based on her race, gender. *Id.*

After considering all the information provided, on January 12, 2016, Aria terminated Williams' employment. **Exhibit 27,** PAW 0043; ARIA-0082**.** Aria has been consistent in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

explaining the reason for Williams' termination.  For instance, Williams' Separation PAN states she was terminated for:

> [m]isconduct; specifically engaging in highly unprofessional, rude and discourteous behavior, where [she] was loud and demeaning in nature as well as engag[ed] in behavior that is in direct violation of the final warning issued on 4/24/15 . . .

*Id.*  Aria's person most knowledgeable regarding Williams' termination, Tamara Lelyk also testified that Williams was terminated for "rude and discourteous conduct, a violation of company policy, otherwise classified as misconduct." **Exhibit 2**, Lelyk Depo. 15:7-8.

### F.   WILLIAMS' ALLEGATIONS CONCERNING HER COWORKERS' CONDUCT.

On January 23, 2017, Williams submitted a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") **Exhibit 28** at PAW 0008.  In her Charge, Williams contends she was discriminated against based on her gender and race and that she was retaliated against for participating in a human resources investigation.  *Id.*  She also claims she was subjected to harassment by co-workers Reed, Fanghao Tian ("Tod" or "Tian"), Jeffrey Baptista ("Baptista") and Guadalupe Jimenez ("Jiminez").  *Id.*  She claims each of these co-workers made racially and sexually offensive comments about her, threatened her, and made fun of her.  *Id.*

On February 24, 2017, the EEOC issued a determination stating that it was "unable to conclude the information obtained established violations of the statutes."  *Id.* at PAW 0009. Nevertheless, Williams repeats the allegations set forth in her Charge in her May 24, 2017 Complaint which is currently pending before this Court.  *See* ECF No. 1, Compl. at ¶19.  Although Williams claims in her Charge and Complaint that she suffered a hostile work environment, during her deposition she could only identify a few sporadic incidents, none of which was severe or resulted in any change in the terms and conditions of her employment.

### 1.   Alleged Racial Comments

When asked during her deposition what her coworkers specifically did that was improper toward her, Williams said Reed, Tian, and Baptista had a conversation "discussing to the point where [she] could hear what they were saying . . . why [she] looked the way [she] looked, speculating what [her] race was."  **Exhibit 5,** Williams Depo. at 32:13-16.  Williams testified the

conversation occurred Williams she was working, her co-workers were working on a line opposite from her, and no managers were around.  *Id.* at 35:22-36:2.  She paraphrased the alleged conversation as follows:

> [Tian asked,] If she's African-American, why is her skin so light?
>
> Why does she look the way she looks?
>
> And George [Reed] was telling him, 'She's Creole.'
>
> And Tod [Tian] is – 'Why does she have green eyes?  Why is her skin so light?'
>
> And Jeffrey [Baptista] was saying, 'Oh, that's because she's a mutt.'

*Id.* at 33:12-18.

Initially, Williams said she could not recall the exact date of the alleged discussion, but she thought it happened sometime between 2015 and 2016.  *Id.* at 32:20-21.  Williams also testified she really did not want to tell anyone about these comments, but claims she finally told Quezada when she was called into human resources regarding the April 15, 2015 incident with Reed.  *Id.* at 33:21-24.  According to Williams, her conversation with Quezada occurred a few days, maybe a week, after the incident where she claims Baptista referred to her as a mutt (i.e., early April 2015).  *Id.* at 37:22-38:4.

Williams also testified that before the conversation between Reed, Tian, Baptista and Jiminez referenced above, Reed made similar comments to the effect to effect of "she is not black" and "she has green eyes".  *Id.*  at 47:2-21.  Reed was speaking to himself, not anyone else, and that that he did not mention her name during this alleged conversation.  *Id.*  He did not make any other comments about her race.  *Id.* at 47:25-48:2.

No additional racial comments were identified by Williams.  She could not remember Jiminez making any comments about her race.  *Id.* at 49:6-8.  She testified that Tian (Tod) only asked the question referenced above about why she looked the way she did.  *Id.* at 48:3-8.  Williams said that only happened one time and she could not recall Tian (Tod) making any other comments about her race.  *Id.* at 48:12-13.  Williams testified that the statement where Baptista alleged referred to her as a mutt as referenced above only happened one time and Baptista made no other race based

1  comments. *Id.* at 48:14-17; 139:2-6. Finally, Williams could not think of any other racial

2  comments directed to her or about her by any other employees during her employment with Aria.

3  *Id.* 177:9-10.

4         1.  <u>Alleged Bumping and Physical Contact</u>

5         In her Complaint, Williams claims George Reed "would frequently bump into her." Compl.

6  at ¶19(d). However, during her deposition, Williams testified that Reed never physically touched

7  her. *Id.* at 45:6-7. She also testified that Tian never touched her. *Id.* at 45:8-11.

8         The only two employees who alleged touched her were Baptista and Jiminez. It is important

9  to note that Williams never saw either Jiminez or Baptista touch her, she nevertheless believes she

10  felt them do so. *Id.* at 43:25-44:2, 44:24-45:2. Specifically, Williams claims there was an incident

11  in 2013 when Baptista touched her bottom as he passed behind her. *Id.* at 40:3-41:4. She claims

12  Baptista did it twice that same evening. *Id.* She also claims there was a similar incident with

13  Jiminez in 2015. *Id.* at 41:16-18. Although Williams could not remember during her deposition

14  what month in 2015 this event allegedly occurred, she did describe it in her February 10, 2015 email

15  to Owen saying, "two different male cooks swipe her derriere as they passed by [her] as [she] was

16  working on her station." **Exhibit 28.** Since Williams testified the incident only occurred one time,

17  the alleged event with Jiminez had to occur on or before February 10, 2015. **Exhibit 5**, Williams

18  Depo. at 41:20-21.

19        When asked if the employees who allegedly bumped her were doing their job or something

20  Aria assigned them, Williams stated, "[n]o. It's like when someone is walking, you're going in one

21  direction, they're coming in the opposite direction, and they deliberately just run into you." **Exhibit**

22  **5,** Williams Depo. at 197:12-14. She further testified that she was not aware of anyone at Aria

23  directing the employees to bump, knock, hit or run into her. **Exhibit** 5, Williams Depo. at 197:20-

24  23; 198:13-17. Williams did not have any physical injuries and did not file any workers'

25  compensation claims relating to any of the alleged bumping incidents. **Exhibit** 5, Williams Depo.

26  at 197:24-198:1.

27        Importantly, Williams also testified that she did not experience any other issues with Reed,

28  Baptista, or Tian [Tod] after the April 15, 2015 incident involving Reed. **Exhibit 5**, Williams Depo.

1   at 142:16-25; 143:1-144:11; 145:22-23.  At the end of her deposition, when her counsel tried to

2   delve deeper into her interactions with Reed, Williams testified:

A      After that day [April 15, 2015] – I don't think there was much interaction
       because I was full-time.  George Reed was, like, steady extra; so he wasn't
       always there or always working on my schedule.

Q      But he did work with you on occasion?

A      I don't think I had to work with him after that.

Q      So you didn't have any interactions with him from that point forward?

A      I don't think so.

**Exhibit 5**, Williams Depo. at 206:22-207:5.

Other than the singular interaction on December 1, 2015 incident described above, Williams

described the incidents with Jiminez as a nuisance.  She said he would just do things that annoyed

her like move the trash can from a place she preferred it to be and not clean up his mess after he

made rice.  *Id.* at 148:14-150:5.  She also said he would stare at her, but that she generally was able

to just stay out of his way.  *Id.*  at 207:24-208:11.  In short, Williams could not identify any specific

incidents where any of her coworkers said or did anything of a racial or sexual nature after April 15,

2015.

## III.   **LEGAL ARGUMENT**

### A.      **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper in this matter because "the pleadings, the discovery and

disclosure materials on file … show that there is no genuine issue as to any material fact."  Fed. R.

Civ. P. 56(c).  There is no genuine issue of material fact if the nonmoving party fails to make a

sufficient showing on an essential element of its case as to which it would have the burden of proof

at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 at 322-23 (1986).    Aria need not negate Plaintiff's

claims, but only establish an absence of evidence to support them.  *Id.* at 322.  Once Aria satisfies

its burden, Plaintiff may not rest on mere allegations or denials but, rather, must present evidence

demonstrating a triable issue of fact.  *Id.*  Plaintiff must do more than simply show that there is

some metaphysical doubt as to the material facts." *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir.

2002) (internal citations omitted).  He must produce specific evidence to show a sufficient evidentiary basis on which a reasonable fact finder could find in his favor. *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 248-49 (1986).  A conclusory, self-serving affidavit is insufficient to create a genuine issue of material fact. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1996) *citing Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) and *United States v. One Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir. 1990).

### B.   WILLIAMS' ASSAULT AND BATTERY CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS, NIIA, AND NRS 41.745.

#### 1.   Williams' Assault and Battery Claims Are Untimely

"Summary judgment is proper when a cause of action is barred by the statute of limitations." *Stalk v. Mushkin*, 125 Nev. 21, 25, 199 P.3d 838, 840 (2009) (quoting *Clark v. Robison*, 113 Nev. Nev. 949, 950, 944 P.2d 788, 789 (1997).  In Nevada, the statute of limitations for assault and battery claims is two years.  Nev. Rev. Stat. § 11.190(4)(c).

When Williams was asked about her assault and battery claim during her deposition, she said that claim was related to "the bumping into me."  **Exhibit 5,** Williams Depo. at 197:6-9. Contrary to the allegation that Reed "would frequently bump into her," Williams testified under oath that Reed never physically touched her.  *Id.* at 45:5-7.  As to the two occasions where she claims she was physically touched by Baptista and Jiminez, one of those alleged incidents occurred in 2013 and the other occurred before February 10, 2015.  *Id.* at 40:16, **Exhibit 10**.  Williams' Complaint was filed on May 24, 2017, more than two years after the alleged touching incidents with Baptista and Jiminiez.  Therefore, her assault and battery claims are barred by the statute of limitations and Aria is entitled to judgment as a matter of law.

#### 2.   Williams' Assault and Battery Claims Are Preempted by NIIA

Nevada Revised Statute 616A.020(1) provides the "rights and remedies provided in [the Nevada Industrial Insurance Act] for an employee on account of an injury by accident sustained arising out of and in the course  of the employment…shall be exclusive of all other rights and remedies of the employee, his personal representatives, dependents or next of kin, at common law

1    or otherwise, on account of such injury."  Additionally, an employer within the provisions of the

2    NIIA "is relieved from other liability for recovery of damages or other compensation for those

3    personal injuries unless otherwise provided by the terms of [the NIIA]."  Nev. Rev. Stat. §

4    616B.612(4).  In *Wood v. Safeway*, 121 Nev. 724, 121 P.3d 1026 (2005), the Nevada Supreme

5    Court held that an assault of an employee in the workplace was preempted by NIIA if "the nature

6    of the employment contributed to or otherwise increased the risk of assault beyond that of the

7    general public."  *Id.* at 736.  "That same assault is not within the NIIA, however, when 'the

8    animosity of the dispute which culminates in the assault is imported into the place of employment

9    from the injured employee's private or domestic life . . . at least where the animosity is not

10   exacerbated by the employment.'"  *Id.*

11          Here, Williams claims that Baptista and Jiminez touched her on two occasions while she

12   was at work doing her job.  Like the plaintiff in *Wood*, the only contact Williams had with Baptista

13   and Jiminez was a result of her employment with Aria.  Even if one were to assume that the alleged

14   bumping events occurred (and there is no evidence they did), as in *Wood*, Williams would not have

15   been assaulted or harassed but for her employment with Aria.  There was no evidence

16   of personal animosity between Williams and Baptista or Jiminez which was imported into the

17   workplace or carried over from their private lives.  She did not know Baptista or Jiminez outside of

18   the workplace and she faced a much greater risk of the alleged assault than that of the general public

19   because of her employment. Therefore, any injury Williams may have had resulting from assault

20   and battery allegedly committed by Baptista and Jiminez are injuries which "arose out of and during

21   the course of her employment" and are barred by NIIA.[6]

22                    2.  <u>NRS 41.745 Bars Recovery on Williams' Assault and Battery Claims</u>

23          In order to hold an employer liable for the intentional torts of an employee, a plaintiff must

24   prove the employee's conduct (a) was not an independent venture, (b) was committed in the course

25

26   _____

27   [6]      Williams did not have any physical injuries and did not file any workers' compensation
     claims relating to any of the alleged bumping incidents.  **Exhibit 5**, Williams Depo. at 197:24-
28   198:1.

1    of his or her assigned tasks, and (c) was reasonably foreseeable in light of the nature and scope of

2    his or her employment." *ASAP Storage Inc. v. City of Sparks,* 123 Nev. 639, 173 P.3d 734, 745 at

3    n. 57 (Nev. 2007); *Wood v. Safeway, Inc.*, 121 Nev. 724, 121 P.3d 1026, 1035 (Nev. 2005); *Hughey*

4    *v. Washoe Cnty.*, 73 Nev. 22, 306 P.2d 1115, 1115 (Nev. 1957)). The "conduct of an employee is

5    reasonably foreseeable if a person of ordinary intelligence and prudence could have reasonably

6    anticipated the conduct and the probability of injury."  Nev. Rev. Stat. § 41.745; *Fleming v. Las*

7    *Vegas Metro Police Dep't*, No. 2:11-cv-00131-MMD-VCF, 2014 U.S. Dist. LEXIS 134336, at *5-

8    6 (D. Nev. Sep. 23, 2014).

9        In this case, when asked if the employees who allegedly bumped her were doing their job

10   or something Aria assigned them, Williams stated, "[n]o.  It's like when someone is walking, you're

11   going in one direction, they're coming in the opposite direction, and they deliberately just run into

12   you."  **Exhibit 5,** Williams Depo. at 197:12-14.  She further testified that she was not aware of

13   anyone at Aria directing the employees to bump, knock, hit or run into her.  *Id.* at 197:20-23;

14   198:13-17.   Based on Williams' sworn deposition testimony, since the employees' conduct was

15   not committed in the course of their assigned tasks or directed by Aria, there is no basis for imputing

16   liability to Aria for any alleged intentional acts of its employees.

17       **C.    WILLIAMS' NEGLIGENT SUPERVISION CLAIM FAILS AS A MATTER**
18            **OF LAW.**

19       Williams' negligent supervision claim is entirely based on her allegations of unlawful

20   discrimination, harassment, and retaliation.  Compl. at ¶¶56, 58.   When tort claims are premised

21   upon alleged discrimination as they are here, those claims are preempted by the comprehensive

22   statutory scheme set forth in Nevada's Employment Practices statute, NRS 613.010 *et seq*.  In *Sands*

23   *Regent v. Valgardson*, 105 Nev. 436 (1989), the Nevada Supreme Court ruled that an employee

24   could not maintain separate tort claims premised upon discriminatory conduct that was subject to

25   the comprehensive statutory remedies provided by NRS 613.310 *et seq*.   Specifically, the

26   *Valgardson* Court held that a plaintiff claiming he was wrongfully terminated due to his age could

27   not maintain a tort claim for wrongful termination in violation of public policy in light of the

28   existence of a comprehensive remedial scheme set forth in Nevada's employment discrimination

1  statutes. *Id.* at 440.[7]  Since there is an adequate statutory remedy for unlawful discrimination,

2  harassment, and retaliation, Nevada courts will not permit a plaintiff to recover in tort for the same

3  claims. *See D'Angelo v. Gardner*, 107 Nev. 704, 710 (1991).  Therefore, Williams' negligent

4  supervision claim should be dismissed.

5          1.  <u>NIIA Preemption</u>

6          The Nevada Industrial Insurance Act provides the exclusive remedy to any employee who

7  is negligently injured in the course and scope of her employment. *Conway v. Circus Circus*

8  *Casinos*, 116 Nev. 870, 8 P.3d 837, 839 (2000).  The Nevada Supreme Court found negligent

9  supervision claims regarding injuries that arose out of the employment and within the course of

10  employment were preempted by NIIA. *Wood*, 121 P.3d at 1034.  This court similarly found that

11  negligent supervision claims similar to those alleged here were preempted by NIIA because they

12  arose of employment and within the course of employment for an employee who, like Williams in

13  this case, alleged her employer failed to properly supervise employees who allegedly engaged in

14  sexual harassment in the workplace. *See Recalde v. Marriott Ownership Resorts, Inc.,* No. 2:15-

15  cv-1627 JCM-NJK), 2016 U.S. Dist. LEXIS 48983, at *8-9 (D. Nev. Apr. 11, 2016).  For these

16  reasons and those set forth in section B.2 above, Williams' negligent supervision claims is

17  preempted by NIIA.

18

19

---

20      [7]      The U.S. District Court for the District of Nevada has repeatedly applied the same rationale

21  and dismissed tort claims when such claims were premised upon discriminatory conduct covered
by state or federal statutes with adequate remedies. *Jackson v. Universal Health Servs.,* No. 2:13-

22  cv-01666-GMN-NJK, 2014 U.S. Dist. LEXIS 129490 (D. Nev. Sept. 15, 2014)(dismissing
negligent hiring, supervision and training claim based on alleged race and gender discrimination

23  when there is an exclusive statutory remedy for these claims). In *Lund v. J.C. Penney Outlet*, 911
F. Supp. 442 (D. Nev. 1996), the Court dismissed the plaintiff's public policy wrongful discharge

24  claim concluding that an available statutory remedy existed under federal law in the ADEA.
*Westbrook v. DTG Operations, Inc.,* No. 2:05-cv-00789-KJD-PAL, 2007 U.S. Dist. LEXIS 14653,

25  at *19 (D. Nev. Feb. 28, 2007) (dismissing negligence *per se* claim based on violations of the
Americans with Disabilities Act); *Colquhoun v. BHC Montevista Hospital, Inc.,* No. 2:10-cv-0144-

26  RLH-PAL, 2010 U.S. Dist. LEXIS 57066 (D. Nev. June 9, 2010) (dismissing negligent hiring,
supervision and training claim based on alleged discrimination, stating "the fact that an employee

27  acts wrongfully does not in and of itself give rise to a claim for negligent hiring, training or
supervision").

28

**D.**   **WILLIAMS HAS NOT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH A CLAIM FOR DISCRIMINATION BASED ON RACE OR SEX.**

1.   Williams Has Not Established A Prima Facie Claim for Discrimination

Title VII discrimination claims are analyzed through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "Under this analysis, plaintiffs must first establish a prima facie case of employment discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  To establish a prima facie case, plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for her position and was performing her job in a satisfactory manner; (3) she suffered an adverse employment action; and (4) that similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action gives rise to an inference of discrimination. *Id.*  Additionally, the Ninth Circuit has held that the same evidentiary standards and analytical framework apply to Section 1981 and Title VII. *See Metoyer v. Chassman*, 504 F.3d 919, 930-31 (9th Cir. 2007).

Although Williams is a member of a protected class based on her race and gender, she was not performing her job in a satisfactory manner.  Prior to her termination, Williams had an extensive, well-documented history of performance problems including six verbal and written warnings, a three day suspension, and a Last and Final Warning.  **Exhibit 8.**  Aria's conduct standards clearly prohibit rude and discourteous behavior.  **Exhibit 1** at ARIA-0670; **Exhibit 2**, Lelyk Depo. at 15:5-8, 16:20-17:5  Clearly, Williams was not performing her job "well enough to rule out the possibility [s]he was fired for inadequate job performance." *See Villarimo v. Aloha Island Air Inc.*, 281 F.3d 1054, 1062-63 (9th Cir. 2002) (quoting *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988).  Therefore, she cannot establish that she was discriminated against because of her race or her gender.

Additionally, Williams cannot demonstrate that Aria treated other similarly situated employees more favorably than she was treated.  "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of L.A.*, 349 F.3d 634, 641 (9th Cir. 2004).  Williams has not identified a single employee who is not African American or female

who engaged in similar misconduct and was treated better than her. *See Cummings v. United Healthcare Servs., Inc.*, No. 2:13-cv-00479, 2014 WL 1302029 at *4 (D. Nev. March 31, 2014 (dismissing discrimination claim where plaintiff did not provide even one example of how other similarly situated non-African American employees received preferential treatment"). For instance, Reed, an African American male cook who engaged in similar conduct on April 15, 2015 received the exact same level of discipline that Williams received. Jiminez is not comparable because, unlike Williams, no corroborating witnesses stated that Jiminez was acting in a rude or discourteous manner and Jiminez did not have a Last and Final Warning in his file that cautioned him that if he engaged in similar misconduct in the future he could be suspended or terminated.

2.   Aria Had Legitimate NonDiscriminatory Reasons for Terminating Williams.

If a plaintiff succeeds in establishing a prima facie case of discrimination, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the alleged discriminatory conduct. *McDonnell Douglas Corp.*, 411 U.S. at 802. If a defendant provides a legitimate, nondiscriminatory reason, then the burden shifts back to the plaintiff to demonstrate that the defendant's given reason is mere pretext for discrimination. *Id.* at 804. "A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011). When a plaintiff's offered evidence of pretext is circumstantial, "the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Id.*

Courts have consistently held that they "should not second guess an employer's exercise of its business judgment in making personnel decisions, as long as they are not discriminatory." *EEOC v. Republic Servs., Inc.* 640 F. Supp. 2d 1267, 1313-1314, 2009 U.S. Dist. LEXIS 39512, *113-115 (D. Nev. 2009). Therefore, an employer's belief that the employee's performance was unsatisfactory, even if mistaken, is not grounds for inferring discrimination. *See Russell v. Placeware, Inc.,* No. Civ. 03-836-MO, 2004 U.S. Dist. LEXIS 21465, 2004 WL 2359971, at *10

1   (D. Or. Oct. 15, 2004)  ("the Ninth Circuit has warned courts to be careful not to punish employers

2   for making valid business decisions") (citation omitted); *Furr v. Seagate Tech., Inc.,* 82 F.3d 980,

3   986 (10th Cir. 1996) (employment laws not violated by erroneous or illogical business judgment);

4   *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988) ("Evidence that an employer

5   made a poor business judgment in discharging an employee generally is insufficient to establish a

6   genuine issue of fact as to the credibility of the employer's reasons."); *Mesnick v. Gen. Elec. Co.,*

7   950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing

8   the merits-or even the rationality-of employers' nondiscriminatory business decisions."); *Nix v.*

9   *WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may

10  fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason

11  at all, as long as its action is not for a discriminatory reason.").

12         The overwhelming and uncontroverted evidence presented by Aria demonstrates its

13  decision to terminate Williams employment was legitimate and nondiscriminatory based solely on

14  her highly inappropriate, rude and discourteous conduct toward an employee in violation of

15  company policy and the April 24, 2015 Last and Final Warning.  See **Exhibit 27.**  Aria's Conduct

16  Standards clearly prohibit employees from engaging in rude or discourteous behavior toward

17  others.  *See* **Exhibit 1** at ARIA-0670.  Even a single failure to follow established policy, such as is

18  the case here, can demonstrate that an employee was not meeting the employer's legitimate

19  expectations at the time of termination.  *See Guerroro v. Beverly Hills* Hotel, 11994 U.S. Dist.

20  LEXIS 21757, *19-21 (C.D. Cal. Feb. 10, 1994) (plaintiff who was terminated for fighting with

21  another employee did not meet expectations where a handbook provision stated that fighting may

22  result in termination).  Here, Williams engaged in multiple incidents of rude and discourteous

23  conduct and Aria received multiple statements regarding the first incident stating that Williams and

24  Reed were loud and yelling at each other.  **Exhibits 11, 12, 17, 18**.  Williams received a Last and

25  Final Warning after her incident with Reed that cautioned similar misconduct may result in

26  suspension and/or termination of her employment.  **Exhibit 19.**  Nevertheless, after receiving a Last

27  and Final Warning on April 24, 2015 and acknowledging that she knew the consequences for

28  similar misconduct could include suspension and/or termination, Williams was involved in a

comparable incident approximately seven months later.  In addition to Jiminez' verbal complaint, Aria received written statements from two witnesses, including Silva, someone Williams considered to be her friend, stating Williams was loud and demeaning toward another employee as she yelled and repeatedly screamed for him to shut up and told him he was nasty.  *See* **Exhibits 23, 24.**  Aria also presented sworn testimony from its Director of Employee Relations, Tamara Lelyk who said that Williams' conduct toward Jiminez was determined to be highly inappropriate, rude, discourteous, in violation of company policy and the April 24, 2015 Last and Final Warning and that it was Williams' conduct which resulted in her termination.  **Exhibit 2,** Lelyk Depo.  at 15:22-16:9; **Exhibit 27**.

> 3.   Williams Cannot Establish Significant and Substantial Evidence of Pretext.

Williams contends she was terminated because of her sex and her race, but she has not presented any evidence demonstrating Aria's stated reason for her termination is pretext.  Evidence of pretext must be "specific" and "substantial" in order to create a triable issue.  *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).  Williams has not presented any evidence, much less "specific" and "substantial" evidence of pretext in this case.

Summary judgment is appropriate when an employee fails to provide evidence that the employer's legitimate nondiscriminatory reason, here that Williams engaged in rude and discourteous conduct after having received a Last and Final Warning, was pretextual.  *See Roeber v. Dowty Aerospace Yakima,* 116 Wash. App. 127, 137-138, 64 P.3d 691, 697 (2003) (the court stated that it is not unlawful for an employer to discharge an employee because the employee who got into an altercation with a coworker is perceived to have misbehaved.)  It makes no sense that after employing her for over six years, Aria would suddenly decide to terminate her employment because of her gender and race, characteristics which have always been visibly apparent.  Williams has not presented any evidence that any of the people involved in the decision to terminate her employment ever made any derogatory statements about her race or gender.  She has not presented any evidence, much less significant and substantial evidence that shows Aria's proffered explanation is inconsistent or otherwise not believable.  *See Noyes v. Kelly Servs.*, 488 F.3d 1163, 1171 (9th Cir. 2007).  Williams' suspicion and personal beliefs alone are not sufficient to raise a

triable issue of fact.  *See Bradley v. Harcourt Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  Given the fact that she was only terminated after she engaged in two incidents of highly unprofessional, rude and discourteous conduct toward co-workers, William cannot establish pretext.  Therefore, Aria is entitled to judgment as a matter of law.

### E.   WILLIAMS WAS NOT SUBJECTED TO ACTIONABLE HARASSMENT BASED ON HER RACE OR SEX AND EVEN IF THE ALLEGED CONDUCT OCCURRED, ARIA CANNOT BE HELD LIABLE.

To establish a prima facie hostile work environment claim under Title VII, an employee must prove must prove that (1) she was subjected to verbal or physical conduct because of her race or gender; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the employee's work environment and create an abusive work environment.  *See See Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995).[8]  Plaintiff cannot meet this burden.

Not all workplace conduct that may be described as offensive affects a term, condition, or privilege of employment within the meaning of Title VII.  *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, (1986) (internal quotation marks and citation omitted).  In order to prevail on a hostile work environment sexual harassment claim, Plaintiff must show that her "workplace [was] ***permeated*** with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and created a hostile working environment.  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, (1993) (emphasis added).[9]  The conduct Williams alleges occurred in this

---

[8]      Hostile work environment claims under Title VII contain the same elements of a § 1981 hostile work environment claim and, thus, the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 n. 3 (9th Cir. 2008) (quoting *Manatt v. Bank of Am., NA,* 339 F.3d 792, 797 (9th Cir. 2003).

[9]      Courts use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment and the working environment must both subjectively and objectively be perceived as abusive. *Id.* at 21-22.  Moreover, in evaluating a hostile work environment, courts should consider: (1) frequency of conduct; (2) severity of conduct; (3) whether the conduct was physically threatening or humiliating; (4) whether the conduct was a "mere offensive utterance"; and (5) whether the conduct unreasonably interfered with work performance." *Id.* at 23.

1  case was neither severe nor pervasive enough to alter the conditions of her employment.  Title VII

2  is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

3  "[S]imple teasing,' . . .  offhand comments, and isolated incidents (unless extremely serious) will

4  not amount to discriminatory changes in the 'terms and conditions of employment." *Harris v.*

5  *Forklift Sys., Inc.,* 510 U.S. 17, 21, (1993).

6       The Ninth Circuit has repeatedly found that occasional racially offensive comments were

7  neither severe nor pervasive enough to alter the terms and conditions of employment.  *See Manatt*

8  *v. Bank of America*, 339 F.3d 792, 799 (9th Cir. 2003) (finding that overheard jokes and comments

9  by coworkers regarding race and ethnicity were not severe nor pervasive enough to alter the

10  conditions of employment); *Vasquez v. County of Los* Angeles 3017 F.3d 884, 893 (9th Cir. 2002)

11  (comments that employee had "typical Hispanic macho attitude" and should work in the field

12  because "Hispanics do good in the field"); *Kortan v. Cal Youth Auth*., 217 F.3d 1104, 1111 (9th

13  Cir. 2000) (finding no hostile work environment even though supervisor referred to females as

14  "castrating bitches," "Madonnas," or "Regina" on several occasions).  In sum, even if it occurred,

15  the alleged conduct does not rise to the level of actionable harassment because it was not sufficiently

16  severe nor pervasive and did not result in any change in the terms and conditions of Williams'

17  employment.

18       In this case, Williams alleges that ***on one occasion*** her coworkers were discussing amongst

19  themselves why her skin and eyes were light and during this conversation Williams claims one of

20  the employees referred to her as a mutt because of her mixed heritage.  **Exhibit 5**, Williams Depo.

21  at 41:12-16.  Williams described the conduct as "things that just annoy you or just – you know, just

22  not be nice." *Id.* at 150:2-5.  She also claims that two male employees allegedly bumped her on

23  two separate occasions in 2013 and before February 10, 2015.  *Id.* at 40:16; **Exhibit 10.**  She does

24  not identify any other physical or verbal conduct by other employees relating to her race or gender.

25       Even putting aside the fact that the alleged conduct was not sufficiently severe or pervasive

26  to deemed a hostile work environment, liability cannot be imputed to Aria because it took

27

28

reasonable precautions to prevent harassment by maintaining handbook policies which both clearly forbade harassment and explained exactly how employees should report complaints of harassment. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998); *Faragher v. City of Boca* Raton, 524 U.S. 775, 807-808 (1998).

Here, there can be no finding that Aria failed to act after learning of Williams' concerns. As detailed above, after Williams provided her February 10, 2015 email to Owens, Aria conducted an investigation wherein human resources spoke to all IRD employees and Aria issued discipline to employees it was able to conclude engaged in inappropriate conduct.  As a preventative measure, all IRD employees attended training.  **Exhibit 5**, Williams Depo. at 64:19-20.  Williams testified that after the April 2015 incident she and Reed did not work together and she did not have any contact with him.  **Exhibit E**, Williams Depo. at 206:15-207:5.  She also admitted that after she complained about the bumping it stopped.  *Id.* at 206:1-11.  Based on Williams' testimony alone, Aria's actions were effective in addressing the alleged conduct.  Therefore, no basis exists for imputing liability to Aria and Williams' sexual harassment hostile work environment claim should be dismissed.

### F. WILLIAMS' RETALIATION CLAIM FAILS BECAUSE SHE CANNOT ESTABLISH THE REQUISITE CAUSAL LINK

Williams bears the initial burden of establishing a *prima facie* case of Title VII retaliation. *Westendorf v. W. Coast Contractors of Nev. Inc.*, 712 F.3d 417, 421 (9th Cir. 2013).  To do so, she must show that: (1) she engaged in an activity protected under Title VII; (2) Aria subjected her to a materially adverse action; and (3) a causal link exists between the two.  *Id.*  In addition, Williams must show that "but for" her protected activity she would not have been subjected to the adverse action.  *University of Texas Sw. Med. Ctr. v.. Nassar*, 570 U.S. 338, 360 (2013).

Here, Aria does not dispute that Williams' engaged in protected activity when she participated in Owens' February 2015 IRD investigation.  However, Williams has not established a causal connection between these actions and that "but for" her protected activity, she would not have been terminated.

Well established case law holds that there is no causal connection between protected activity and an adverse action, thus making summary judgment appropriate, if an employee cannot show that the person responsible for the adverse action was aware of the employee's protected activity. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-274 (U.S. 2001); ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity"); *Raad*, 323 F.3d at 1197-1198 (failure to show decision makers' knowledge of employee's prior protected activity was fatal to employee's retaliation claim); *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1035 (9th Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff presented no evidence that decision maker knew about protected activity); *see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  In this case, Williams has not presented any evidence that anyone knew she spoke to Owen in February 2015 or sent him an email with allegations about inappropriate conduct by coworkers.  Williams testified that she did not tell others that she had spoken with Owen, no one asked her whether she spoke with Owen, and she did not know for certain that anyone was aware she went to human resources. **Exhibit 5**, Williams Depo. at 67:25-68:13; 71:3-6.

Additionally, temporal proximity between protected activity and an adverse employment, unless "very close" does not, by itself suggest causality. *Breeden*, 523 U.S. at 273-274.  Here, there is no close proximity in time between the Williams' protected activity and her termination.  There was approximately 11 months between the date when Williams emailed Owen on February 10, 2015 and her January 12, 2016 termination.  The Ninth Circuit previously held that a 10 month period was insufficient to establish causation through temporal proximity.  *See Villiarimo v. Aloha Air,* 281 F.3d 1054, 1068 (9th Cir. 2002).

Moreover, Williams cannot show that "but for" her protected activity she would not have been terminated.  She had a well-documented history of performance problems, including but not limited to the April 2015 Last and Final Warning which specifically warned that if she engaged in similar conduct she could face suspension and/or termination.  **Exhibits 8, 19**.

Aria is entitled to summary judgment since Williams has not demonstrated a causal connection between her protected activity and the adverse action.  *See Lopez v. Pacific Maritime*

*Assoc.*, 657 F.3d 762, 768 (9th Cir. 2011) ("because the record contains no evidence supporting an essential element of [p]laintiff's . . . claim, we must affirm summary judgment.")

### G. WILLIAMS' REQUEST FOR PUNITIVE DAMAGES MUST BE DISMISSED.

Punitive damages may only be awarded where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice. *Kress v. Corey*, 65 Nev. 1 (1948). In this case, Williams has presented no evidence establishing grounds justifying an award of punitive damages. Therefore, there is no genuine issue of material fact and Aria is entitled to summary judgment as a matter of law dismissing Plaintiff's request for punitive damages.

### IV. CONCLUSION

For each and all of the foregoing reasons, Aria respectfully requests that the Court grant Aria's motion for summary judgment against Plaintiff Patricia Williams.

Dated this 30th day of November, 2018.

JACKSON LEWIS P.C.

*/s/ Lisa A. McClane*

Lisa A. McClane, Bar #10139
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
*Attorneys for Aria Resort & Casino*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I am an employee of Jackson Lewis P.C. and that on this 30th day of

November, 2018, I caused to be served a true and correct copy of the above and foregoing

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** via ECF filing, to the following:

Robert P. Spretnak
8275 S. Eastern Ave., Suite 200
Las Vegas, Nevada 89123

*Attorney for Plaintiff*

_____/s/ Lisa A. McClane_____
Employee of Jackson Lewis P.C.

Jackson Lewis P.C.
Las Vegas

28